| | | |
|---|---|---|
| JAMIE LUSKIN | * | IN THE UNITED STATES |
| 111 South Calvert Street | | DISTRICT COURT |
| Suite 1805 | * | FOR THE DISTRICT OF MARYLAND |
| Baltimore, Maryland | | |
| 21202 | * | |
| | | |
| Plaintiff, | * | |
| | | |
| v. | * | |
| | | |
| THE UNIVERSITY OF MARYLAND | * | |
| COLLEGE PARK, MARYLAND | | |
| | * | |
| SERVE ON: | | |
| Office of the Attorney General | * | |
| Civil Litigation Division | | |
| 200 Saint Paul Place | * | |
| Baltimore, Maryland | | |
| 21202 | * | |
| | | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT FOR VIOLATION OF 20 U.S.C. § 1681

Plaintiff Jamie Luskin, by and through her undersigned attorneys, sues Defendant University of Maryland, College Park for denying her equal access to educational opportunities in violation of Title IX of the Education Amendments of 1972, found at 20 U.S.C. § 1681, and states:

### Jurisdiction and Venue

1. Jurisdiction is proper in this Court under 28 U.S.C. § 1331, as this case involves claims arising under the laws of the United States.

2. Specifically, Plaintiff's claims arise from Defendant's violation of 20 U.S.C. § 1681.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events or omissions that give rise to the claims occurred in Maryland.

## Parties

4.      Plaintiff Jamie Luskin is a graduate student in University of Maryland's Chemical Physics Ph.D. program.

5.      Defendant University of Maryland, College Park ("UMD") is a higher education entity located 7950 Baltimore Avenue, in College Park, Maryland.

6.      UMD receives Federal Financial Assistance from the Federal Government.

## Factual Allegations

A.      Background

7.      Ms. Luskin is a multidisciplinary scientist with training in both Chemistry and Physics.  During her undergraduate career at the University of Florida, she conducted interdisciplinary Quantum Chemistry and Computational Biophysics research.  As an undergraduate at University of Florida, she taught more than 400 students and implemented curriculum design that is still in place today.

8.      Ms. Luskin is pursuing her graduate research in experimental atomic and optical physics.  She was selected to participate in the 69th Annual Lindau Nobel Laureate Meeting.  This highly prestigious meeting brings together 30-40 Nobel Laureates and 500 of the world's leading young scientists to foster an open exchange of ideas about the direction of science and societal issues.

9. In 2017, Ms. Luskin was awarded a fellowship for a doctoral degree in Chemical Physics at the University of Maryland, College Park.

10. Ms. Luskin then joined a research group, led by a Nobel Prize-winning scientist, at the prestigious Joint Quantum Institute ("JQI").

11. In March 2017, UMD directed Ms. Luskin and other prospective students to share contact information with their classmates.

12. As a result, fellow student, C.H.[1] acquired Ms. Luskin's cell number and personal email address.

13. Ms. Luskin did not know C.H.

B. <u>C.H.'s initial outburst and UMD's nonresponse</u>

14. On February 13, 2018, Ms. Luskin was studying with four students, Eli Mizrachi, Donny Pearson, and two others in the UMD's Toll Physics building.

15. Unexpectedly, a Spanish advertisement played loudly on Ms. Luskin's computer and the group began to laugh.

16. C.H. immediately burst into the common room and screamed at Ms. Luskin and her study group, "What's so funny!?"

17. As Mr. Mizrahi attempted to explain, C.H. punched the door and screamed "Is that fucking funny?!" C.H. punched the door again, screaming "That's what I fucking thought!" and stormed out of the room.

---

[1] The Complaint uses a pseudonym for this person because Ms. Luskin fears violent retribution from him.

18.     Two days later, Mr. Mizrachi and Ms. Luskin reported the event to UMD's Behavior Evaluation and Threat Assessment team ("BETA").[2]  Both were concerned and scared by C.H.'s erratic behavior.

19.     BETA case manager Maria Lonsbury brushed off the reported incident stating that she hoped "this was just an atypical outburst on his part."

20.     BETA failed to act on the report and never followed up with Ms. Luskin or Mr. Mizrahi regarding the report.

C.     <u>C.H.'s second threatening outburst</u>

21.     On the night of April 12, 2018, C.H. cornered Ms. Luskin alone in her office.  He accused Ms. Luskin of "ignoring" him and accused her of causing his social isolation.

22.     Ms. Luskin attempted to de-escalate the situation, but C.H.'s intensifying aggressive behavior made Ms. Luskin fear for her safety so she fled her office.

---

[2] Per UMD, "The BETA (Behavior Evaluation and Threat Assessment) Team evaluates reports about University of Maryland students who are concerning, disruptive, or threatening." *https://studentaffairs.umd.edu/staff-faculty/beta-team#/about-the-beta-team.*

23.     After the incident in Ms. Luskin's office, C.H. accused her of making fun of him:



Apr 12, 2018, 3:01 PM

Please, could you keep this conversation between us two (at least not let it spread to any of the students)? I don't want to feel like you've been gossiping and making fun of me with your group, especially Eli. And I'm sure you have. I don't want to come off as demented but I've been seriously upset most of the year and I've never really gotten it off my chest, for fear of ridicule. I could go into more detail, but it seems like it just puts you on the defensive.

Thanks. Anyway, I'll stop bothering you now.

24.     Ms. Luskin was disturbed by C.H.'s delusional and paranoid assumptions.

25.     Ms. Luskin made a second report to BETA and forwarded C.H.'s text messages to Ms. Lonsbury.  UMD, however, took no action.

26.     Ms. Luskin also contacted the UMD Physics Department Chair, the UMD Chemical Physics Program Coordinator, and the UMD Police Department to report the harassment.

27.     All of the individuals who received the reports were Responsible University Employees[3] pursuant to UMD policy.  As such, they each had a duty to report the conduct to the Title IX Office.

28.     Despite the actual notice of C.H.'s harassment, UMD took no action.

D       <u>UMD's indifference continues as the harassment intensifies</u>

29.     On May 8, 2018, C.H. sent a series of extremely disturbing text messages to Ms. Luskin.  The messages clearly demonstrate his inappropriate interest in, and gender-based anger towards, her:

---

[3] Pursuant to the applicable policy, the Title IX office "shall receive all reports of Sexual Misconduct received by any individual deemed a 'Responsible University Employee. . .'"

**May 8, 2018, 10:01 AM**

See? I was right.

The question is why? Why have you excluded me this entire year?

It's not like I've never made any attempts to reach out to you.

But I won't bend over backwards like your orbiters.

I have more self respect than that.

Do you want to talk about this? Or are you just going to ignore me?

**May 8, 2018, 1:27 PM**

> Hey Calvin, I don't mean to ignore your texts. You're obviously very upset with me and I honestly just haven't been sure how to handle things. I never intended to make you feel bad, and it seems like you've misinterpreted a lot of my actions.

**May 8, 2018, 3:20 PM**

Then can you explain why you've acted the way you have been?
Why you've never seemed comfortable with me in the office save for that day when Renjie and I was chatting, a conversation which you rudely hijacked by the way, and that day I asked you what programming language you used (and there was a particular reason why I asked that, which I am not sure if it is worth pursuing anymore)? When I said good morning to you when you arrived, you completely ignored me and started to talk with someone else over the phone. I thought you might have been busy, but when I walked in to QM class, you were laughing about it with Eli. Explain to me how I should interpret this. Why do you hang out with him anyway?

What else about me have you been telling him? You must have said things to him, otherwise he wouldn't have decided to sit right behind me on the 1st day of stat mech class for no apparent reason. You must have remembered that say haven't you? You decided to go up and talk to everyone but me, strangely, except when you stepped on my foot and yelled sorry, which doesn't count because it is not a proper greeting. You didn't ask me how I was doing or how things have been. I literally cried the next morning. There is too much resentment now, which is why, Jamie, neither of us really know how to handle this. But maybe you can start by explaining it from your point of view. You called me weird when you brought that guy over to the office that day too. How do you explain that?

Ok I was not expecting my text to have turned into a txt file but it was a lot

> Honestly from my perspective since the beginning of the fall semester I've been just going about my business when I'm in that office and treating you no differently than anyone else there. Im not super outgoing in that space and I tend to be preoccupied with work when I'm around there. again I'm sorry if it has come across the wrong way somehow. And I really don't sit around and gossip with Eli at all. if over the past few weeks you have sensed that I am a bit standoffish, it's simply because I sense that you're really upset with me, and like I said I'm not sure how to handle it so my response has been to keep to myself. I'm sorry if that has just upset you even more. It just seems surprising that you're this upset with me given how brief our interactions have been

You haven't addressed everything. You've always been standoffish and given me little attention, ever since we first met on the campus visit day. I was sitting in the back of Chris's car while you chatted as if I wasn't there. When we got to campus, I offered some guidance to directions and you just blew me off. That you've place me so low in your priorities and how I seem so insignificant to you is exactly the reason why I am so upset. Maybe if you weren't one of the few who happen to share the same year and department with me I'd not care, but I thought we would have grown to have been good friends and taken on grad school together as a team. But it looks like you found your own team. Didn't think twice about me did you?

Then what were you and Eli laughing about that day? You clearly told him I said good morning to you and he found it stupidly hilarious.

I'm not sure why it wasn't apparent that I had been upset with you all of this time, or why you only admit to being standoffish during only the past couple of weeks.

I don't mean to be inexact, time sort of flies here and I will admit that I have been standoffish for longer than that. It is truly because I've sensed that you have this animosity towards me and I guess I can be bad with confrontation in these situations so my instinct is to avoid it.

Honestly I can't remember specifically what Eli was laughing about that morning because it wasn't anything significant. it really could have been anything silly, but I can promise you it had nothing to do with you.

If I had anything inherently against you from the beginning I wouldn't have given you my number in the first place. In my mind this just happened to not develop into a friendship but I never had any sort of agenda to exclude you

I feel like you don't trust me enough to be completely sincere, or I was so insignificant to you that you remember so little about me. Do you remember when you gave me your number?

I don't remember every detail of that interaction but I recall being around PSC for something and I was leaving and felt inclined to reach out and give you my number since we were both new and getting oriented.

start a new chapter. So I truly probably couldn't recall the details about how I exchanged contact information with anyone

Right. I got it. It was just a little test to see how reliable the things you say are. I've been in situations where recollection of details is very important so maybe I have unreasonable expectation of others.

How do you feel about all of this? I was worried opening up to you would be a risk because I couldn't be sure how you'd react.

I honestly just wanted to clear the air with you, as I really don't want problems with anyone. There's enough pressure on us as it is and the last thing we need is to stress eachother out. So I guess the main thing I wanted to accomplish with this dialogue was to convey that I genuinely have nothing against you. Best of luck with finals these next two weeks

Okay. My goal was to give you my thoughts so that you understand of how I've felt. I'm not sure if I've accomplished that. But maybe that was too much information at once. Good luck on finals as well.

But could I ask one more question? What made you wear that ring on your index finger? What's the story behind it? It can't just be a coincidence that it happens to be the same finger I wear the ring you must have seen me wear can it?

To be honest, my sister gave me that ring over winter break and it happens to only fit on my index finger. Just so there is no misunderstanding with this moving forward, I'm in a serious relationship and am not seeking anything with anyone here outside of that

I see. I got my ring at a Navajo souvenir shop at the 4 corners during my road trip from LA to Maryland. So is being in a relationship a reason you've been standoffish? I mean I wasn't always upset with you.

Well, ok. Whoever he is, he must be an amazing guy. Is he a Maryland student as well? He must take you on really wonderful dates doesn't he? Did he get you something thoughtful for Valentine's day? It must be absolutely surreal just being in his company. I guess I have to respect that. I only wish I could be that person for someone.

Good night.

30.     Ms. Luskin again reported C.H.'s harassment to BETA and attached the text messages.

31.     In response, Ms. Lonsbury shifted responsibility to Ms. Luskin, stating "don't let him push you out of class and make you afraid."

32.      Apathetic to Ms. Luskin's reports, BETA instead directed Ms. Luskin to meet with Dr. Carlton Green at UMD's counseling center.

33.     UMD's gender bias is reflected in its analysis: Ms. Luskin's fear, not C.H.'s harassment, was the "problem" that UMD sought to resolve.

34.     Ms. Luskin met with Dr. Green at the counseling center.  Dr. Green was the first UMD employee to mention that Ms. Luskin could direct her complaint to the Office of Civil Rights and Sexual Misconduct (the "Title IX Office").

35.     Pursuant to the applicable UMD Title IX policy, "Sexual Misconduct" includes gender-based conduct that interferes with a student's academic performance.

36.     C.H.'s text messages, and his physical intimidation of Ms. Luskin was "Sexual Misconduct" pursuant to UMD policy.

37.     On May 9, 2018, Ms. Luskin filed a complaint with UMD's Title IX Office, attaching relevant text messages.

38.      The Title IX Office purports to administer UMD's non-discrimination policies, including Title IX.  Ms. Luskin related the incidents with C.H. and again provided UMD with all relevant text messages and details.

39.     Ms. Luskin's father contacted UMD President Dr. Wallace Loh.  Mr. Luskin restated Ms. Luskin's earlier reports to UMD, and explained the negative impact

that C.H.'s harassment was causing on his daughter. Mr. Luskin begged UMD to allow his daughter to continue her education by ending the harassment. Mr. Luskin gave UMD actual notice of the harassment and consequences of the harassment.

40.     UMD did not respond.

E.     <u>UMD's failure to act and continued harassment post title IX complaint</u>

41.     After Ms. Luskin made her Title IX complaint to UMD, C.H. accusatorily texted Ms. Luskin:

May 9, 2018, 6:55 AM

Why did you report me student affairs?

I thought you said you wanted to clear the air with me. I wanted to handle this at the lowest level, which is why I communicated specifically with you. If I wanted to speak to someone about this I would have, and I have. Are you trying to make life more difficult for me? This is not clearing the air.

May 9, 2018, 9:09 AM

I don't want to do that either. I hope that you can respect that

May 9, 2018, 2:23 PM

Do you not want me talking to you at all?

42.     On May 9, 2018, Mr. Luskin emailed the Chair of BETA Chair to notify him that Ms. Luskin "has been the subject of an irrational infatuation of another first year candidate … who has demonstrated exceptionally inappropriate aggressive and violent behavior that has made her feel that she may ultimately be unsafe." Mr. Luskin included on that email Dr. Andrea Goodwin, Director of UMD's Office of Student Conduct, Marta Hopkinson, Director of UMD's Behavioral Health and University Health Center, Sharon Kirkland-Gordon, Director of UMD's Counseling Center, and Ms. Lonsbury. Mr. Luskin questioned UMD's complete lack of meaningful response and again pled with UMD to allow her to study without harassment. Ms. Luskin had no idea how to respond to C.H.'s inappropriate communications. Ms. Luskin feared that anything she did would put her in harm's way and trigger additional violent outbursts. All of Mr. Luskin's communications were phrased as begging the university to intervene.

43.     This email was further actual notice to appropriate individuals of C.H.'s gender-based discrimination and harassment of Ms. Luskin.

44.     After filing her May 9, 2018 complaint with the Title IX Office, Ms. Luskin again contacted Professor Peter Shawhan seeking assistance from the Physics Department.

45.     She received no meaningful response.

46.     Ms. Luskin also contacted Debbie Jenkins, the Chemical Physical Program Coordinator, and her Professor Ted Jacobson, to inform them of the ongoing harassment and UMD's indifferent response.

47.     Individually, and collectively, the plethora of reports provided multiple actual notices to UMD of C.H.'s gender-based harassment of Ms. Luskin.

48.     May 10, 2018, UMD, though the Office of Student Conduct (not the Title IX Office) issued an administrative no contact order to C.H.  The order prohibited C.H. from having any contact with Ms. Luskin.

49.     A no contact order is an "Interim Protective Measure" pursuant to UMD's applicable Title IX policies, and signals to the complainant, *i.e.*, Ms. Luskin, that a Title IX investigation is underway.

50.     Ms. Luskin was never given a copy of the no contact order.

51.     No investigation was underway.

52.     UMD never shared the duration of the order, nor the penalties for violating it, with Ms. Luskin.

53.      Shortly thereafter, the Spring 2018 semester ended and, on information and belief, C.H. left UMD's campus for a short study-abroad program.

F.     UMD's continued failure to respond to actual notice of gender-based harassment

54.     On October 15, 2018, C.H. accosted Ms. Luskin once again in her office. He was not speaking rationally and began yelling about the no contact order.

55.     C.H. grew angrier and angrier and declared that "you guys" (Ms. Luskin and Mr. Pearson) "talk an awful lot to be just friends."

56.     After Ms. Luskin escaped, Mr. Pearson locked himself in a separate room while C.H. attempted to enter.

57.     Mr. Pearson escaped and met up with Ms. Luskin.  Together, they attempted to reach the Title IX Office.  Upon spotting them, C.H. pursued them on an adjacent sidewalk.

58.     At the Title IX Office, Ms. Luskin informed UMD police that C.H. violated UMD's no contact order.

59.     Title IX investigator Mark Nelms, alone in a room of empty desks, told Ms. Luskin that there was nothing the Title IX Office could do for her and that she needed to go to District Court.

60.     UMD Police classified the incident as "Harassment/Stalking" and provided her with a Title IX pamphlet. They also suggested she request a peace order from the District Court Commissioner.

61.     That evening, the District Court Commissioner granted Ms. Luskin a Temporary Peace Order against C.H.

62.     This episode would not have occurred if UMD had responded appropriately.

63.     Despite this evidence of continued harassment and intimidation, UMD chose to ignore its obligation responsibilities it had to assure compliance with Federal laws governing Title IX complaints.

64.     The harassment and stalking were based on Ms. Luskin's gender, as C.H. repeatedly asked intrusive questions regarding her "relationship."

65.     On October 17, 2018, Ms. Luskin filed a supplemental complaint with the Title IX Office notifying them of C.H.'s continued gender-based harassment.

66.     That same day, C.H. was served with the temporary peace order, by UMD police, in Dr. Goodwin's office.

67.     However, no one at UMD took any steps to separate C.H. from Ms. Luskin.

68.     Ms. Luskin was afraid to even attend class, and she informed UMD of this fact.

69.     In desperation, Ms. Luskin contacted eight UMD administrators to beg for assistance regarding the ongoing threats from C.H., and give them actual notice of gender-based harassment.

70.     Each of these eight UMD employees were Responsible University Employees pursuant to UMD's Title IX policy, and were required to report the harassment to the Title IX office.  They did not.

71.     On October 17, 2018, Ms. Luskin emailed Dr. Goodwin and Dr. Zacker, to whom Mr. Luskin had previously made a complaint of C.H.'s "exceptionally inappropriate aggressive and violent behavior."

72.     Ms. Luskin informed them that she would be forced to leave UMD if it continued to ignore C.H.'s escalating harassment and intimidation.

73.     On October 18, 2018, Ms. Luskin met with Dr. Goodwin personally.

74.     Dr. Goodwin was non-responsive to C.H.'s harassment.

75.     Again, UMD failed to take any action to protect Ms. Luskin from gender-based harassment.

G.     The collapse of UMD's Title IX Office

76.     On October 24, 2018, Ms. Luskin, without UMD's support, obtained a final peace order from the District Court.

77.     The final peace order required C.H. to "provide [UMD with] weekly schedules of his whereabouts on campus to avoid all interaction with Ms. Luskin."

78.     UMD, however, refused to communicate with Ms. Luskin regarding C.H.'s schedule to ensure that she and C.H. would not be put in the same place at the same time.

79.     UMD's inaction created an environment in which C.H. continued to encounter his victim on UMD's campus.

80.     Not only did UMD fail to act, but it essentially deprived her of the Court-ordered protection through its non-compliance.

81.     On August 14, 2018, UMD's Title IX Officer resigned, having previously complained that the office was under-resourced and "not adequately staffed to respond" to Title IX complaints.

82.     In her place, UMD appointed Dr. Goodwin as an interim Title IX co-director.[4]

83.     Two weeks later, on August 30, 2018, the Title IX Office's Deputy Director, Lead Investigator, and Intake Specialist all announced their resignations, effective in early October.

84.     On November 16, 2018, Ms. Luskin, through private counsel, wrote to UMD demanding that UMD respond to her complaints of C.H.'s harassment.

---

[4] The Title IX Office would not get a replacement full-time Director until March 3, 2019.

85.     Ms. Luskin cited UMD's violation of Title IX and documented UMD's inexcusable failure to act after receiving numerous complaints of harassment that was so severe and pervasive that it interfered with Ms. Luskin's education.

86.     On November 30, 2018, UMD attorney, Diane Kresja directed Ms. Goodwin to schedule a meeting with Ms. Luskin and the UMD Police.

87.     At the resulting December 5, 2018 meeting, Dr. Goodwin admitted that she could not manage the terms of the final peace order on her own.

88.     While the final peace order required C.H. to provide his schedules to UMD, UMD refused to coordinate his schedule or inform Ms. Luskin of his whereabouts.

89.     Dr. Goodwin told Ms. Luskin "you should send me your upcoming semester schedule, but I am only one person and I can't manage this schedule coordination alone."

90.     After refusing to fulfill its Title IX obligations, Dr. Goodwin revealed that UMD Title IX Office never even conducted an investigation of Ms. Luskin's repeated complaints, in complete disregard of UMD's Title IX policy.

91.     Dr. Goodwin hypothesized that "it is possible that before the previous director resigned, she looked at the case and knew that we wouldn't be able to suspend or expel [C.H.] and she decided not to pursue it."

92.     In fact, there is no evidence that the former Title IX Director was even aware of Ms. Luskin's numerous complaints.

93.     Dr. Goodwin even admitted that UMD's inaction stemmed from a concern that suspending or expelling C.H. would result in lawsuit against UMD.

94.     Specifically, the following exchange took place:

**Dr. Goodwin**: "We can't just expel someone or suspend them without any reason to."

**Ms. Luskin** "I think that the case for suspension or expulsion is more than reasonable."

**Dr. Goodwin** "I have done everything in my power to exercise all of the disciplinary actions available to me, and suspension or expulsion isn't one of them. Lately, the federal government has cracked down a lot about universities expelling students without due process. Some universities are getting sued and they are having to reinstate students who were previously expelled."

**Ms. Luskin** "So you are essentially telling me that you are more concerned about a lawsuit from [C.H.] if you suspend or expel him than you are concerned with my safety and security even though I am the innocent victim here."

E.      UMD's final act of indifference

95.     As the Spring 2019 academic semester began, UMD allowed C.H. to enroll in Ms. Luskin's classes. UMD also required Ms. Luskin to take her qualifying exams in the same room as C.H.

96.     When Ms. Luskin protested, the only reassurance she received was that "there will be a professor there at all times."

97.     After UMD allowed C.H. to enroll in Ms. Luskin's classes, and as a direct result of its blatant indifference, Ms. Luskin terminated the pursuit of her Ph.D.

98.     UMD's repeated failure to act upon C.H.'s obsession-based harassment of Ms. Luskin and his outrageous behavior denied Ms. Luskin the ability to complete her Ph.D. program.

99.     C.H. is still a Ph.D. candidate of UMD.

100.    Over the course of the 2017-2018 academic year, Ms. Luskin notified over a dozen UMD university employees pursuant to the Defendant's Title IX policy.  UMD's non-response was manifestly unreasonable.

<u>UMD's Inherent Gender Bias</u>

101.    Of the top 25 US institutions for Physics, using the most recent three years of available data (2015-2017), UMD performs the lowest of all institutions, with just 9.9% of its Physics Ph.D.'s granted to women during that period.

102.    The highest performing institution for this metric, out of the top 25 schools ,is Northwestern University, where 24.8% of Physics Ph.D.'s granted between 2015-2017 were granted to women.  UMD's 9.9% is significantly low.  The average for all 25 institutions is 17.1%.

103.    In the 2017-18 academic year, the Title IX Office received 249 reports of sexual or gender-based misconduct.  Of those, only 91 became formal complaints and UMD only conducted 18 investigations.

104.    With the lowest percentage of female graduates among comparable universities, UMD has apparently fostered a culture when women are not welcome in its science programs.

<u>COUNT I</u><br>
<u>VIOLATION OF TITLE IX</u><br>
<u>DEFENDANT UMD</u><br>
<u>(20 U.S.C. § 1681, <i>et seq.</i>)</u><br>
(UMD's Deliberate Indifference<br>
to Alleged Sexual Harassment)

105. All numbered paragraphs of this Complaint are incorporated by reference as if stated in full herein.

106. The gender-based harassment articulated in this Complaint was so severe, pervasive, and objectively offensive that it deprived Ms. Luskin of access to educational opportunities and benefits provided by UMD.

107. UMD created and/or subjected Ms. Luskin to a hostile educational environment in violation of Title IX because:

a) Ms. Luskin was a member of a protected class;

b) she was subjected to gender-based harassment in the form of stalking and implicit threats of violence by another student;

c) she was subjected to harassment based on her gender; and

d) she was subjected to a hostile educational environment created by the UMD's lack of policies and procedures and failure to properly investigate and/or address the gender-based harassment.

108. UMD had actual notice and knowledge of the harassment of Plaintiff.

109. UMD's failure to investigate and discipline C.H. in a timely manner and consistent with its own policy violated federal and state law.

110. UMD's inactions resulted in Ms. Luskin suffering additional intimidation and harassment in her efforts to hold onto her position. Ms. Luskin ultimately believed she would not be safe from additional intimidation and harassment when the Maryland court order would expire. Ms. Luskin reasonably concluded that she would have to leave Maryland to avoid potential threat and harm from C.H.

111.    Ms. Luskin was forced to engage in frantic effort to leave Maryland with a Master's Degree instead of a Ph.D. so as to avoid leaving with "nothing to show" for her time.  Ms. Luskin wasted a year of her life disconnected from her study of Physics in a Ph.D. track that the University was obligated to provide upon accepting her into their program and her passing appropriate milestones.  Ms. Luskin was further disconnected from her research in Atomic Molecular and Optical Physics within a research group supervised by a Nobel Laureate, and was left with no valid options.

112.    In contrast, C.H. continued his research without interruption or a single disciplinary action levied against him.

113.    UMD's failure to promptly and appropriately respond to the alleged gender-based harassment, resulted in Ms. Luskin, on the basis of her gender, being excluded from participation in, being denied the benefits of, and being subjected to discrimination in UMD's education programs in violation of Title IX.

114.    UMD failed to take immediate, effective remedial steps to resolve the complaints of sexual harassment and instead acted with deliberate indifference toward Ms. Luskin.

115.    UMD persisted in its actions and inaction even after it had actual knowledge of the harm suffered by Ms. Luskin, and allowed the harm to grow.

116.    UMD's policies and practices constituted disparate treatment of females and had a disparate impact on female students.

117.    Ms. Luskin has suffered emotional distress and psychological damage, and her character and standing in her community have suffered from the harassment fostered

as a direct and proximate result of UMD's deliberate indifference to her rights under Title IX.

WHEREFORE Plaintiff Jamie Luskin requests a judgement be entered in her favor against Defendant UMD as follows:

A. Compensatory damages for her psychological and emotional distress and damages, loss of standing in her community, damage to her reputation, and her family's unreimbursed out of pocket expenses incurred in response to these circumstances in excess of $75,000;

B. Injunctive relief requiring Defendant UMD to take effective steps to prevent gender-based discrimination and harassment in its education programs; fully investigate conduct that may constitute gender-based harassment; appropriately respond to all conduct that may constitute gender-based harassment; and mitigate the effects of harassment by eliminating any hostile environment that may arise from or contribute to it;

C. Statutory interest;

D. Costs; and

E. Reasonable attorney fees.

/S/ Rignal W. Baldwin V
Rignal W. Baldwin V
Federal Bar No.: 30136
Stuart M.G. Seraina
Federal Bar No.: 25971
BaldwinLaw LLC
111 South Calvert Street

Suite 1805
Baltimore, Maryland 21202
Telephone: (410) 385-5695
Facsimile: (443) 703-7772
rbaldwinv@baldwinlawllc.com
*Attorneys for Plaintiff Jamie Luskin*

## CERTFICATE OF NO RESTRICTED INFORMATION

The undersigned counsel certifies that the foregoing does not contain any restricted information.

/S/ Rignal W. Baldwin V
Rignal W. Baldwin V
Federal Bar No.: 30136
Stuart M.G. Seraina
Federal Bar No.: 25971
BaldwinLaw LLC
111 South Calvert Street
Suite 1805
Baltimore, Maryland 21202
Telephone: (410) 385-5695
Facsimile: (443) 703-7772
rbaldwinv@baldwinlawllc.com
*Attorneys for Plaintiff Jamie Luskin*