IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| JAMIE LUSKIN, | * |
| | * |
| Plaintiff, | * |
| | *    Civil Action No. 8:20-cv-02393-PX |
| v. | * |
| | * |
| THE UNIVERSITY OF MARYLAND, | * |
| COLLEGE PARK, | * |
| | * |
| Defendant. | * |
| | * |
| | *** |

## MEMORANDUM OPINION

Pending before the Court in this sex discrimination action is the motion for summary judgment filed by Defendant University of Maryland, College Park ("the University"). ECF No. 21. Plaintiff Jamie Luskin, a graduate student, contends that the University is liable for failing to respond adequately to a fellow student's harassment aimed at her, in violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681, *et seq.* ("Title IX"). Finding no hearing necessary, and for the following reasons, the motion for summary judgment is GRANTED. *See* D. Md. Loc. R. 105.6.

I.  **Background**[1]

Jamie Luskin enrolled in the Chemical Physics Ph.D. program at the University in the fall of 2017. ECF No. 21-9 at 7. As part of a highly specialized interdisciplinary program, Luskin was placed with a small cohort of five classmates, including the male student who harassed her, C.H. *Id.* Because this suit centrally concerns the University's response to Luskin's complaints about C.H., the Court first describes the three interconnected departments that handle incidents

---

[1] Because the parties have filed most exhibits under seal, this Opinion is filed under seal for seven days, after which time the Opinion will be unsealed. By August 5, 2022, the parties must inform the court whether and which, if any, part(s) of the Opinion should remain under seal and provide grounds in support of the sealing request.

of student misconduct, and next details Luskin's interactions with C.H. that triggered the departments' involvement.

### A. University Departments That Handle Misconduct Complaints

The University receives and responds to student misconduct complaints through three interrelated departments: the "BETA Team," the Office of Student Conduct ("OSC"), and the Office of Civil Rights and Sexual Misconduct ("OCRSM"). *See* ECF Nos. 21-8 at 5; 21-3 at 3; 21-7 at 2–3. The University also has its own campus police department. *See* ECF Nos. 21-3 at 11; 21-4 at 4. Typically, all complaints are first routed through the BETA Team, which is tasked primarily with evaluating a complaint and then directing it to the proper department for follow up investigation. ECF No. 21-5 at 11; *see also* ECF No. 21-8 at 5–6. The BETA Team includes representatives from the University Police Department, the OSC, the Counseling Center, and Mental Health Services. ECF No. 21-8 at 5.

Once the BETA Team receives a complaint, it assesses the nature and severity of the situation and decides whether the matter is best handled by another University department, or whether the Team can address the matter with a simple phone call or student welfare check. ECF Nos. 21-8 at 7–8; 21-5 at 11. If further attention is required, the BETA Team often refers the matter to the OSC or OCRSM. *See* ECF No. 21-5 at 11.

The OSC handles all student incidents that potentially violate the University of Maryland Code of Student Conduct. ECF Nos. 21-5 at 5; 21-7 at 2; 21-3 at 10. Accordingly, it receives complaints for everything from academic or honor code violations to interpersonal conflicts between students. *See* ECF Nos. 21-5 at 5; 21-7 at 2–3. Notably, the OSC is the only department at the University with authority to hold students accountable for misconduct and issue no-contact orders. *See* ECF Nos. 21-5 at 6-7; 21-7 at 2; *see also* ECF No. 21-6 at 10. The

OSC issues final decisions about whether a student violated the Code of Student Conduct only after seeking review and recommendation from a separate disciplinary panel. ECF Nos. 21-5 at 10–11; 21-7 at 7–12.

The OCRSM focuses more narrowly on complaints involving sexual misconduct or discrimination. ECF No. 21-3 at 10. The department includes two dedicated Title IX investigators, and the head of the OCRSM also acts as the University's Title IX Officer. ECF No. 21-6 at 6. When the OCRSM receives a complaint, an intake specialist first screens it to ascertain whether it involves sex-based misconduct or discrimination. *See id.* If in the OCRSM's view the complaint does not fall within these parameters, the OCRSM refers the matter to the OSC to handle. *Id.* The Title IX Officer ultimately decides whether a matter remains with the OCRSM or is referred elsewhere. *See id.*

### B. C.H.'s Conduct Toward Luskin and the University's Response

Luskin first met C.H. in the spring of 2017 at a new students' orientation. ECF No. 21-9 at 8–9. At the time, C.H. appeared "quiet" and "withdrawn." *Id.* at 9. The two barely interacted during the orientation. Likewise, during the fall semester, Luskin and C.H. spent very little time together, even though they shared office space and had a class in common. *Id.*

In the beginning of 2018, however, the nature of their interactions changed. On February 13, 2018, Luskin and three other students—Eli Mizrachi, Jessie Hankes, and Donny Pearson— were talking in the graduate student lounge. ECF No. 21-9 at 11. The group spontaneously laughed at an image on Luskin's computer just as C.H. was passing by the lounge. ECF Nos. 22-1; 38 at 3; 21-9 at 11–12; 21-4 at 4. C.H. quickly became "very violent." ECF Nos. 21-9 at 11; 30-2 at 4. He started punching the wall and "screaming vulgarities" at the group, demanding to know why they were laughing. ECF Nos. 21-9 at 11; 22-1. The group tried to explain that they

3

were not laughing at C.H., but he was inconsolable. The group eventually closed the lounge door and remained locked inside until C.H. departed. ECF Nos. 21-9 at 11; 22-1.

Luskin, Mizrachi, Hankes, and Pearson immediately alerted the University to C.H.'s troubling behavior. Mizrachi submitted a formal report to the BETA Team that described C.H.'s strange outburst. ECF No. 22-2. BETA Team Case Manager, Maria Lonsbury, acknowledged receipt of the report by email, adding, "Let's hope this was just an atypical outburst on his part." *Id.* at 3. In response to the report, the BETA Team checked its records on C.H. to determine whether any other student had reported alarming conduct by C.H. ECF No. 21-8 at 6. The BETA Team also contacted C.H.'s professors to learn whether the student had behaved strangely in other contexts. From this, the BETA Team concluded it would monitor the situation for any potential escalation. ECF Nos. 21-11 at 5; 21-9 at 15; 21-8 at 6. No one reached out to C.H. directly to discuss the outburst, and no further action was taken. ECF No. 21-11 at 5.

The next incident between Luskin and C.H. occurred on April 12, 2018, in the office space that Luskin and C.H. shared. As Luskin was gathering her belongings to leave for the day, C.H. confronted Luskin about why she was "excluding" him from their cohort. ECF No. 30-2 at 5. C.H. was "very angry" and was "fixating" on the notion that Luskin's exclusion of him was intentional. *Id.* at 5–6. Luskin tried to apologize and diffuse the situation, but C.H. responded repeatedly that it was "too late." *Id.* Although by Luskin's account, C.H. did not make any sexual advances or insinuate he wanted to date her, he nonetheless made her uncomfortable and afraid in the way he expressed an entitlement to her attention. *Id.* at 6. The encounter lasted only a few minutes before Luskin left. *Id.* Afterward, C.H. texted Luskin to ask that she not share this exchange with any other student. ECF No. 22-2.

4

In short order, Luskin and Mizrachi again reached out to the University about C.H. Mizrachi alerted the BETA Team that C.H. was "still in distress," as evident from the April 12th encounter. ECF No. 22-2 at 2. Mizrachi expressed his "significant concern" because "[C.H.] appears to irrationally think we've formed a high school-like clique where we make fun of him." *Id.*

Mizrachi and Luskin together also contacted Peter Shawhan, the Physics Department Chair, to alert him of the situation and ask for help. ECF Nos. 22-3; 21-4 at 4; 21-9 at 13. Shawhan suggested that Luskin be reassigned to a different office space away from C.H., which the University eventually helped to coordinate. ECF Nos. 21-9 at 14–15; 22-3. Luskin also contacted multiple faculty members and followed up with the BETA Team, through Lonsbury, to see what steps the department had taken. ECF No. 21-9 at 13–14.

Following the April 12th encounter, Luskin attests that she was "flooded" with text messages from C.H., although the record does not quite reflect such a "flood." ECF Nos. 30-2 at 8; 21-9 at 15; *see* ECF Nos. 22-5; 22-6.[2] The record is also not clear on how C.H. obtained her phone number. *Compare* ECF No. 22-5 at 13 (Luskin texting C.H. that she "felt inclined to reach out and give you my number since we were both new and getting oriented") *with* ECF No. 21-9 at 14 ("I didn't give it to him."). In any event, Luskin explains that she engaged in the text exchange with C.H after having tried to "get some guidance from Maria Lonsbury," regarding C.H. ECF No. 21-9 at 15. But after Luskin received no useful advice, she decided she "had nothing to lose" by engaging C.H. in a text exchange. ECF Nos. 38 at 3; 21-9 at 15.

---

[2] The screen captures of the text messages appear to obscure the dates and times for every exchange. However, reading the texts in the order they naturally appear, C.H. and Luskin exchanged about twenty text messages over two days, May 8 and 9, 2018. ECF Nos. 22-5; 22-6.

In the text conversation, C.H. confronted Luskin about ignoring him, expressing frustration that Luskin had always been "standoffish" and had given him "little attention." ECF No. 22-5 at 10. In response, Luskin apologized to C.H. for unintentionally making him feel excluded. *Id.* at 13–17. Despite Luskin's apologies, C.H. continued, demanding to know whether Luskin remembered giving him her phone number. *Id.* at 13. C.H. also accused her of "mistaking [him] for another guy," adding "[i]t must be hard to keep track when there seem[] to be so many trying to get your attention." *Id.* Next, C.H. commented that he and Luskin wear similar rings on their index fingers which "can't just be a coincidence." *Id.* at 17. Luskin dismissed the notion and responded that she was in a relationship and not interested in anyone else. *Id.* at 18. C.H. mused in response if that is why she had been "standoffish," and asked whether her boyfriend is a student, if she received a gift on Valentine's Day, and where they went on dates. *Id.* at 18–19. C.H. ended with, "I guess I have to respect that. I only wish I could be that person for someone." *Id.* at 19.

The same day as the text exchange, Luskin met with Lonsbury in person. ECF No. 21-9 at 17. Because Luskin was visibly upset, Lonsbury escorted her to the counseling center to meet with a University therapist. ECF Nos. 21-9 at 18; 21-4 at 6. Very early the next morning, C.H. texted Luskin and demanded to know why she had reported him to the OSC. ECF No. 22-6. Luskin responded that she did not want to discuss the issue any further with C.H. *Id.*

Also on May 9th, Luskin went to the OCRSM to file a sexual misconduct report against C.H. and seek a no-contact order against him. ECF Nos. 38; 21-4 at 7. Luskin met in person with an Intake Specialist and filed an online complaint. ECF Nos. 30-8; 22-7; 21-4 at 7. Luskin provided the May 8th text messages and described her "ongoing issues" with C.H., including the February 13th group confrontation in the student lounge, the April 12th confrontation in the

shared office space, and the most recent text exchange. ECF No. 38. Specifically, Luskin explained how C.H.'s statements "made it apparent that he is fixating on [Luskin] in a very [i]rrational way." ECF No. 38. Luskin also accused C.H. of complimenting her looks, obsessing over "certain physical things about [her]," and asking invasive questions about her current relationship. ECF Nos. 38; 30-3.

The Title IX Officer and head of the OCRSM at the time, Catherine Carroll, promptly reviewed Luskin's complaint. Carroll determined that because the alleged misconduct "did not present as something that was specific to her as a female or anything that was sex based," it fell outside the purview of Title IX. ECF No. 21-6 at 8. Carroll based this decision exclusively on her review of the complaint and attached text exchange, and because the alleged misconduct did not include any "gendered language" or involve any romantic relationship. ECF No 21-6 at 8–9; *see also* ECF No. 30-6. Thus, in Carroll's view, the OSC remained the best suited department to deal with the complaint. Carroll nonetheless recommended to the OSC that it issue a no-contact order against C.H. ECF Nos. 22-7; 30-7.

The next day, the OSC, through Director of the Office of Student Conduct Dr. Andrea Goodwin, issued the no-contact order, which specifically forbade C.H. from interacting with Luskin at all. ECF Nos. 22-8; 21-5 at 23. Dr. Goodwin also directed C.H. to meet with her to review the order, which C.H. did. ECF No. 21-5 at 15–16. During the meeting, Dr. Goodwin found C.H. to be "isolated" and "jealous of Jamie and her ability to have friends." *Id.* at 16. Dr. Goodwin denies that C.H. expressed any type of romantic fixation with Luskin. *Id.* at 17.[3]

Even with the no-contact order in place, Luskin and C.H. both remained in the graduate program, which meant Luskin occasionally ran the risk of encountering C.H. For example,

---

[3] The BETA Team Chair, Dr. John Zacker, also within the OSC, met with C.H. and agreed with Dr. Goodwin's assessment. ECF No. 21-8 at 8.

Luskin and C.H. had been required to give oral presentations in a shared class. ECF No. 22-10. However, after Luskin alerted her program coordinator to this, she and C.H. were permitted to submit a written assignment instead. ECF No. 21-9 at 21. Luskin's professors also allowed her to take her final exam in a separate room from C.H. *Id.* at 20.

Luskin had also signed up for summer study sessions related to certain qualifying exams to be taken in August of 2018. However, once she learned that she would have to join the Facebook discussion group that included C.H., she stopped attending the study sessions. ECF No. 21-9 at 21. Luskin did not ask for any assistance from the University regarding these sessions. *Id.* However, when it came time for the August exams, Luskin asked for—and received—professors on-site to monitor C.H. ECF No. 22-12. Luskin and C.H. took their qualifying exams without incident. ECF No. 21-9 at 21.

In the fall of 2018, Luskin and C.H. had at least one class together and began the semester without difficulty. ECF No. 21-9 at 22. But on October 15, 2018, C.H. burst into Luskin's student office and confronted her about the no-contact order. ECF No. 21-9 at 22–23. C.H. then demanded to know the nature of her relationship with another male student, Pearson. *Id.* C.H. appeared "angry, red in the face, hands in his pockets." *Id.* at 22. Terrified, Luskin ran out of the office and rushed directly to the OCRSM to report C.H.'s violation of the no-contact order. *Id.* at 24. She also reported the incident to the campus police. ECF Nos. 22-13; 21-9 at 24; 21-4 at 7. All the while, C.H. was "circling" her from a distance as she walked through campus on her way to report the violation. ECF No. 21-9 at 24.

At the OCRSM, Luskin met with another employee, Mark Nelms. Nelms accepted Luskin's complaint but filed it as a student conduct incident report for referral to the OSC, not as a Title IX matter to be handled by the OCRSM. ECF No. 21-9 at 24–25. The report stated that

Luskin did not "feel safe" in the same building as C.H. and that she "would like for him to be suspended [and] excluded from campus." ECF No. 22-13. Nelms also advised Luskin that if she wanted immediate additional protection off-campus, she could obtain a Peace Order from the Prince George's County Circuit Court. ECF No. 21-9 at 24. Luskin followed this advice, ultimately securing a Peace Order for a six-month period. ECF No. 22-15 at 4. This Order barred C.H. from contacting Luskin at all and from entering her residence or office. *Id.* The Order also required C.H. to provide campus police a weekly schedule of his whereabouts. *Id.*

The next day, October 16, 2018, Dr. Goodwin informed C.H. that he was charged with violating the Code of Student Conduct for failing to comply with the no-contact order. ECF No. 22-14. The OSC also immediately barred C.H. from all classes for the rest of the week and from entering the Atlantic Building, where students in the program took class and had laboratory space. *Id.* C.H. was also directed to meet with Dr. Goodwin and the campus police the following day. ECF Nos. 21-4 at 8; 21-5 at 25.

At the meeting with Dr. Goodwin, C.H. admitted that he had violated the no-contact order. ECF No. 21-5 at 25–26. In response, the OSC directed C.H. to undergo a psychiatric evaluation and required that he attend online any class he shared with Luskin. ECF No. 21-5 at 25, 28. C.H. was also expected to follow the terms of the Peace Order. ECF No. 22-15.

Dr. Goodwin next met with Luskin to inform her of C.H.'s new restrictions. ECF Nos. 21-9 at 25; 21-4 at 7–8. Luskin maintains that she had to "really press[]" Dr. Goodwin for any information about how the University responded to C.H.'s ongoing misconduct. ECF No. 21-9 at 25. Dr. Goodwin, in contrast, attests that she and a campus detective fully explained to Luskin the new restrictions placed on C.H., and that Luskin "asked . . . many questions." ECF No. 21-5 at 32; *compare* ECF No. 21-4 at 20 (noting that Dr. Goodwin or campus police contacted Luskin

9

on November 19 and December 4, 2018, about C.H.'s restrictions) *with* ECF No. 21-9 at 25 (Luskin claiming that "no one coordinated" C.H.'s restrictions with her). In any event, Luskin viewed the plan going forward as "laughable." ECF No. 21-9 at 25. According to Luskin, she would still "run into [C.H.] around campus from time to time" and was "constantly living in fear." *Id.* at 25–26.

On November 28, 2018, the OSC informed C.H. in writing that he had violated the Student Code of Conduct by breaking the no-contact order. ECF Nos. 21-4 at 15; 22-16. As a sanction, C.H. was placed on disciplinary probation until the end of the semester. ECF Nos. 21-4 at 15; 22-16. During the probationary term, C.H. was not in good standing with the University, and a "judicial hold" prevented the release of his transcript or any diploma. ECF No. 22-16. Additionally, the OSC created a disciplinary file for C.H. which would be maintained for three years. *Id.* C.H. was further barred from entering the Atlantic Building except for predesignated entrances and exits, and he could use only specific stairwells and hallways within the building. ECF Nos. 21-5 at 25; 22-16; 21-4 at 15. Last, C.H. was forewarned that any violation of the no-contact or Peace Order could result in additional sanction, to include suspension or expulsion. ECF No. 22-16.

Thereafter, Luskin switched her programming track to receive a master's degree instead of a Ph.D. ECF No. 21-9 at 26. Luskin attributes the switch to her inability to work in the same department as C.H. and still wanting "something to show for those two years." ECF No. 21-9 at 26. But after receiving her master's degree in May of 2019, Luskin reenrolled in the Chemical Physics Ph.D. program at the University. She continues her studies while residing in California and is on track to receive her degree. ECF No. 21-9 at 1–3, 27–28. She has no plans of physically returning to the University campus. *Id.* at 27.

### C.  This Lawsuit

On August 18, 2020, Luskin sued the University, alleging a single count of sex discrimination in violation of Title IX.  ECF No. 1.  Luskin avers the University was deliberately indifferent to the sexual harassment of C.H., creating a hostile environment that deprived her of equal access to educational opportunities.  ECF No. 1 ¶¶ 106–117.  The University timely answered the Complaint (ECF No. 5), and on January 10, 2022, moved for summary judgment in its favor.  ECF No. 21.

## II.  Standard of Review

Summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)) (alteration in original).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment."  *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).  But "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'"  *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967)).  Where the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is warranted. *Celotex*, 477 U.S. at 322.

### III. Analysis

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Unlawful sex discrimination includes sexual harassment. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 686 (4th Cir. 2018) (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649 (1999)). Likewise, student-on-student harassment is actionable under Title IX. *Davis*, 526 U.S. at 650. To establish a student-on-student sexual harassment claim, the plaintiff must show that (1) she attended an educational institution that receives federal funds; (2) she suffered harassment because of her sex; (3) the harassment was so severe and pervasive that it deprived her of equal access to an educational benefit; and (4) "there is a basis for imputing liability to the institution." *Feminist Majority Found.*, 911 F.3d at 686; *see also Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 263–64 (4th Cir. 2021), *petition for cert. docketed*, No. 21-968 (U.S. Jan. 6, 2022).

The parties do not dispute that the first element is satisfied. However, the University vigorously contends that no reasonable juror could find in favor of Luskin on the remaining elements. The Court examines each in turn.

#### A. Harassment Based on Sex

To establish a Title IX sexual harassment claim, the plaintiff must show that the harassment was "on the basis of sex." 20 U.S.C. § 1681(a). Luskin points to four encounters with C.H. that, in her view, collectively demonstrate she had been harassed on the basis of her

sex: (1) C.H.'s February 13th group outburst and punching of a wall; (2) C.H.'s April 12th confrontation; (3) the May 8th text exchange; and (4) C.H.'s October 18th outburst and contemporaneous violation of the no-contact order. *See* ECF No. 29 at 10–12. Luskin argues that together these incidents allow a rational factfinder to infer that C.H. was "fixated" on Luskin as a woman with whom he had a romantic interest. ECF No. 29 at 10. The University maintains that because C.H. used "absolutely no sex-specific language" nor engaged in "sex-specific actions," any harassment Luskin experienced is not sex-based. ECF No. 21-1 at 27, 24–28.

Harassment occurs when the victim is subjected to "discriminatory intimidation, ridicule, and insult." *Doe v. Salisbury Univ.*, 107 F. Supp. 3d 481, 487 (D. Md. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Sex-based harassment occurs when "the victim is subjected to sex-specific language that is aimed to humiliate, ridicule, or intimidate." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007); *see Salisbury Univ.*, 107 F. Supp. 3d at 488 ("[A] claim of sexual harassment must allege sex-specific conduct aimed to humiliate, ridicule, intimidate, or insult."); *see also* 29 C.F.R. § 1604.11(a) (2022) (defining sexual harassment for Title VII as "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.").[4] Conduct stemming from sexual desire includes "explicit or implicit proposals of sexual activity, objectively offensive touching of a sexual nature, and sexually charged comments." *Doe v. Bd. of Educ. of Prince George's Cnty.*, 982 F. Supp. 2d 641, 651 (D. Md. 2013) (internal quotations omitted), *aff'd*, 605 F. App'x 159 (4th Cir. 2015).

Viewing the record most favorably to Luskin, a reasonable juror could conclude that C.H.'s actions toward her were harassment because of her sex. C.H. appeared to desperately seek Luskin's attention, and angrily demand it. In April of 2018, C.H. cornered Luskin alone,

---

[4] Courts interpreting Title IX may look to Title VII jurisprudence for guidance. *See, e.g., Jennings*, 482 F.3d at 695.

after-hours, and required to know why she was not spending time with him. ECF No. 21-9 at 12–13. C.H. followed on with texts complaining about Luskin's inattention, coupled with invasive questions about her romantic life, and insinuating that Luskin's ring was some kind of tribute to their relationship. *See* ECF Nos. 22-5; 22-6. C.H. also commented "[i]t must be hard to keep track when there seems to be so many [guys] trying to get your attention," and pressed as to why she only considered him as "insignificant." ECF No. 22-5 at 13–14. C.H. next violated the no-contact order so that he could probe Luskin about the nature of her relationship with another male graduate student and was "circling" Luskin as she rushed through campus to report the violation. ECF No. 21-9 at 23–24. A factfinder could reasonably find these interactions, in total, give rise to the inference that C.H. wanted a romantic relationship with Luskin and thus targeted her because of her sex. The University's arguments on this point fail.

### B. Severe or Pervasive Harassment

Next, the University argues that no rational factfinder could conclude the incidents involving C.H. were "so severe, pervasive, and objectively offensive that it effectively barr[ed] . . . [Luskin's] access to an educational opportunity or benefit." *Feminist Majority Found.*, 911 F.3d at 686 (quoting *Davis*, 526 U.S. at 633); ECF No. 21-1 at 30–31. In response, Luskin highlights that C.H.'s "overtly violent" and "aggressive" outbursts alone are sufficient. ECF No. 29 at 12.

Severe and pervasive harassment is conduct that creates "an environment" which a reasonable person in the plaintiff's position would find "hostile or abusive." *Jennings*, 482 F.3d at 696. By contrast, "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminat[ion]." *Jennings*, 482 F.3d at 696 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "[C]ommon sense and an

appropriate sensitivity to social context" is the touchstone of the analysis. *Fairfax Cnty. Sch. Bd.*, 1 F.4th at 275 (internal alteration omitted) (citing *Jennings*, 482 F.3d at 696). Accordingly, the ages and positions of the parties, the frequency of harassment, whether the harassment was physically threatening, the severity of the conduct, and the extent to which the harassment negatively impacted the plaintiff's education, remain relevant in ascertaining whether the claim survives on this element. *See Jennings*, 482 F.3d at 696.

When viewing the record in the light most favorable to Luskin, it is admittedly a close call. Although the University rightly contends that the entirety of the claim rests on four encounters over eight months, each lasting only minutes, certain of the encounters were violent and severe. On one occasion, C.H. punched a wall and screamed at students, including Luskin. On another, he was visibly red with anger as he probed Luskin's inattentiveness toward him. C.H.'s texts, some at early morning or late hours, were invasive and disturbing in tone and content. C.H. also violated the no-contact order and physically "circled" her as she rushed to report the violation. A rational factfinder could conclude that C.H. had created a hostile and abusive environment for Luskin.

That said, the inquiry does not end with whether C.H. objectively created a hostile or abusive environment. Rather, the Court must also assess whether Luskin could demonstrate that these encounters barred her access to educational opportunities. To demonstrate such deprivation, Luskin must adduce facts that the harassment either (1) resulted in her "physical exclusion" from a program or activity; (2) undermined and detracted from her educational experience such that she is effectively denied access to the institution's resources or opportunities; or (3) had a "concrete, negative effect" on her ability to participate in her education. *Fairfax Cnty. Sch. Bd.*, 1 F.4th at 275 (citing *Jennings*, 482 F.3d at 699).

When viewing the record most favorably to Luskin, she cannot show physical exclusion or denial of access to her education. Indeed, the record clearly reflects that the University's timely response to C.H.'s harassment is what allowed Luskin to advance her studies. Luskin was permitted to change her oral assignment to a written presentation so to avoid C.H.; Luskin's professors allowed her to take exams in a separate room, and later provided adequate in-person professor presence—at her request—so she could take her qualifying exams successfully. Indeed, by her own admission, Luskin's academic performance was "consistently good" throughout her difficulties with C.H. ECF No. 21-9 at 26.

Nor can she demonstrate a "concrete, negative effect" on her ability to participate in her program. *See Fairfax Cnty. Sch. Bd.*, 1 F.4th at 275. To be sure, Luskin now emphasizes that she opted to secure her master's degree instead of a Ph.D. ECF Nos. 21-9 at 26; 30-17. But choosing to obtain a master's degree after two years of academic success does not amount to a negative effect on her education, especially where she ultimately re-enrolled in the Ph.D. program and is on track to receive her degree. ECF No. 21-9 at 5, 27. On this alone, no reasonable factfinder could conclude that her encounters with C.H. visited a concrete and negative effect on her academic future. *Cf. Fairfax Cnty. Sch. Bd.*, 1 F.4th at 275–76 (denial of educational benefits after student was sexually assaulted and she began performing poorly in her classes, limited her participation in school activities to avoid harasser, and suffered psychological and emotional trauma that altered her daily functioning); *Karanik v. Cape Fear Acad.*, No. 21-CV-169-D, 2022 WL 2195293, at *11 (E.D.N.C. June 17, 2022) (student plausibly alleged denial of educational benefits when she experienced panic attacks in class, resorted to self-study alone instead of attending class, and was forced to take a class on Zoom rather than in person when school refused to switch her to a different course away from harassers); *Vance v. Spencer Cnty.*

*Pub. Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000) (denial of educational benefits when student suffered from repeated physical and verbal abuse from peers over several years, causing her to withdraw from school).  In short, because no evidence permits the rational conclusion that C.H.'s harassment barred Luskin from access to educational benefits, the claim does not survive challenge.

### C.  The University's Liability

Alternatively, even if Luskin was somehow barred from accessing educational opportunities at the University, no facts support a finding of liability against the institution.  An institution will only be liable for known student-on-student harassment where its response, or lack thereof, is so clearly unreasonable that it amounts to deliberate indifference.  *See Davis*, 526 U.S. at 648.  Importantly, schools are afforded "a great deal of flexibility in disciplining students who sexually harass other students." *Feminist Majority Found*., 911 F.3d at 686 (internal quotes omitted) (citing *Davis*, 526 U.S. at 648).  "[A]n institution is not normally liable for failing to cede to a harassment victim's specific remedial demands," or by refraining from imposing discipline that may open the institution to legal challenge from the accused.  *Id.*  Rather, an institution exhibits deliberate indifference when its response is "clearly unreasonable in light of the known circumstances."  *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016) (quoting *Davis*, 526 U.S. at 648).

The University rightly contends that, viewing the record most favorably to Luskin, its response to C.H.'s misconduct cannot amount to deliberate indifference.  At the first sign of Luskin's trouble with C.H., the BETA Team contacted C.H.'s professors to gauge his stability and assess whether he presented a threat to the students.  ECF Nos. 21-11 at 5; 21-9 at 15.  Then, in response to C.H.'s April 12th outburst and May 8th texts, the OSC issued a no-contact order

requiring that C.H. stay away from Luskin indefinitely. *See* ECF No. 30-5. Luskin's department likewise worked to keep the two students apart, moving Luskin's office, and modifying certain assignments and exam conditions. ECF Nos. 21-9 at 20–21; 22-10.

When C.H. violated the no-contact order in the fall of 2018, the OSC responded swiftly. C.H. immediately was barred from campus, and next placed on disciplinary probation. ECF Nos. 22-14; 21-5 at 25. Dr. Goodwin also developed a safety plan that coordinated C.H.'s laboratory time around Luskin and required C.H. to use a certain route in and out of the Atlantic Building. ECF Nos. 22-15; 22-16. C.H. also had to undergo a psychiatric evaluation. ECF No. 21-5 at 28. On this record, no reasonable factfinder could conclude that the University's response was "clearly unreasonable." *See S.B. ex rel. A.L.*, 819 F.3d at 77 (for disability harassment under Title IX, no deliberate indifference when record conclusively showed school investigated and responded to every incident of alleged harassment); *Bd. of Educ. of Prince George's Cnty.*, 982 F. Supp. 2d at 641 (no deliberate indifference when teacher rearranged seating chart in class to separate victim and harasser, provided victim with escort to bathroom where harassment had occurred, and required harassing student to use a sign-in/sign-out procedure for bathroom breaks); *cf. Feminist Majority Found.*, 911 F.3d at 690 (deliberate indifference plausible when complaint alleged that university "made no real effort to investigate or end the harassment and threats"); *Jennings*, 482 F.3d at 700–01 (deliberate indifference question for jury when school's response to student's request for help with coach's harassment was to "work out her problems directly with him" because coach was a "great guy").

Attempting to save the claim, Luskin finds fault with the OCRSM's refusal to treat her complaints as "sex-based" and failing to conduct a full Title IX investigation. ECF No. 29 at

19–22. Her argument misses the mark.[5] Even assuming the University did not meet its own Title IX protocols, "fail[ing] to strictly adhere to [] sexual harassment policies . . . is not determinative." *Bd. of Educ. of Prince George's Cnty.*, 605 F. App'x at 168. Rather, the central inquiry remains whether the University's response was clearly unreasonable under the circumstances. *See Doe v. Bd. of Visitors of Va. Mil. Inst.*, 494 F. Supp. 3d 363, 378 (W.D. Va. 2020) ("Although it was not a Title IX investigation, [the institution's] actions constituted a reasonable response, carried out in a manner that resulted in disciplinary action against the student-Defendants."). Put differently, assuming the OCRSM should have deemed this a "sex-based" harassment, this failure alone does not generate a dispute of fact as to whether the University's response to the known threat was "clearly unreasonable."

Nor does the University's failure to remove C.H. from the program equate to deliberate indifference, as Luskin suggests. Luskin's mere disagreement with the University's response does not give rise to the inference that what the school *did* do was clearly unreasonable. *Bd. of Educ. of Prince George's Cnty.*, 982 F. Supp. 2d at 657–58 (citing *Davis,* 526 U.S. at 648) (noting that Title IX plaintiffs lack the "right to make particular remedial demands"); *S.B. ex rel A.L.*, 819 F.3d at 77 (quoting *Davis*, 526 U.S. at 648) (explaining that school is not deliberately indifferent when it fails "to impose the disciplinary sanctions sought by a victim."). Because no evidence suggests that the University acted with deliberate indifference, the Title IX claim against the University fails.

---

[5] Luskin also generally argues that the deliberate indifference inquiry is ill-suited for resolution at summary judgment. ECF No. 29 at 21–22. But where, as here, the record indisputably demonstrates that the defendant-institution took a series of reasonable and responsive steps to stop the harasser, the deliberate indifference inquiry is no less capable of resolution at summary judgment than any other element of the claim. *See S.B. ex rel A.L.*, 819 F.3d at 77; *Bd. of Educ. of Prince George's Cnty.*, 605 F. App'x at 169.

## IV. Conclusion

In sum, perhaps a trier of fact could conclude that C.H harassed Luskin on account of her sex. But nothing in the record supports that these incidents, as terrible as they were for Luskin, denied her access to educational opportunities at the University. Nor do any facts allow liability to be imputed to the University. Accordingly, the University's motion for summary judgment in its favor on the Title IX claim must be granted. A separate order follows.

July 29, 2022                              /S/
Date                                       Paula Xinis
                                           United States District Judge